An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-585

NORTH CAROLINA COURT OF APPEALS

Filed:  4 March 2014

LORIE ANN PATTERSON,
     Plaintiff

v.

UNIVERSITY FORD, INC.,
     Defendant

Durham County
No. 11 CVS 2376

Appeal by plaintiff from judgment entered 19 October 2012 and orders entered 1 November 2012 and 25 March 2013 by Judge Michael J. O'Foghludha in Durham County Superior Court.  Heard in the Court of Appeals 10 October 2013.

*Mario M. White, for Plaintiff.*

*Poe Law Firm, PLLC, by G. Jona Poe, Jr., for Defendant.*

ERVIN, Judge.

Plaintiff Lorie Ann Patterson appeals from a judgment entered based upon a jury verdict finding that Plaintiff and Defendant did not enter into a contract and that Defendant did not convert a 2010 Mustang that belonged to Plaintiff and from orders denying Plaintiff's motions for judgment notwithstanding the verdict and for a new trial.  On appeal, Plaintiff argues that the trial court erred by failing to instruct the jury that

the Uniform Commercial Code controlled the transaction between the parties and by denying Plaintiff's motions for directed verdict, judgment notwithstanding the verdict, and a new trial. After careful consideration of Plaintiff's challenges to the trial court's judgment and orders in light of the record and the applicable law, we conclude that the trial court's judgment and orders should be affirmed.

## I. Factual Background
### A. Substantive Facts

On 20 November 2010, Plaintiff drove to Defendant University Ford's place of business in Durham for the purpose of purchasing a 2010 Ford Mustang. Prior to that date, Plaintiff had applied for automobile financing through a third-party website which had, in turn, forwarded that request to several entities, including Defendant. As a result, one of Defendant's employees contacted Plaintiff and requested that she fax a copy of her pay stub to Defendant prior to her arrival at the dealership. Plaintiff had been under the impression that she would be able to get the vehicle that she wanted when she arrived at the dealership, and she became upset upon learning during discussions with Defendant's employees that certain potential issues relating to her credit application could prevent her from making the purchase that she had in mind.

According to Plaintiff, she was eventually informed by Defendant's general manager that she had been approved to purchase a Mustang, picked out the vehicle she wanted, and took it for a test drive. After driving the vehicle, Plaintiff signed several documents, including a retail installment sales contract, or RISC, which specified the terms and conditions, including the amount financed and the interest rate, under which the vehicle sale would be made. Although the RISC listed Plaintiff as the buyer and Defendant as the seller/creditor, the contract also stated that Defendant had "assign[ed] its interest in this contract to C&F Finance Company (Assignee) under the terms of Seller's agreement(s) with Assignee."[1] In addition, the RISC stated that "[t]his contract contains the entire agreement between you and us relating to this contract," that "[a]ny change to this contract must be in writing and we must sign it," and that "[n]o oral changes are binding."

Simultaneously with the execution of the RISC, Plaintiff signed a conditional delivery agreement, or CDA, which provided that:

> University Ford is delivering this automobile based on the credit information received from the customer. Final approval

---

[1]Although Plaintiff originally testified that Defendant had never informed her that C&F Finance Company would be financing the sale, she later admitted on cross-examination that the RISC provided that the purchase would be financed by C&F.

of the terms of a retail installment sales contract rests solely with a lender. The terms of the retail installment sales contract are not binding until accepted by a designated lender. This contract is cancelled if the terms are rejected by a lender. If the contract is cancelled, the dealer will return the customer's deposit and trade-in vehicle. The customer agrees to pay for any damages done to the automobile during the time they had possession, and also agrees to indemnify University Ford for any damages caused to a third party. If the contract is cancelled, the customer will return the vehicle to University Ford within 24 hours of being notified by the dealer.[2]

According to Defendant's controller, Don Colclough, the execution of a CDA along with an RISC is standard industry practice as specifically authorized by North Carolina law. In addition, Mr. Colclough testified that the CDA was part of the RISC, that Defendant did not finance vehicle purchases, that an agreement for the purchase of a vehicle was not finalized until the necessary financing arrangements had been made, and that Defendant never intended to accept payments directly from Plaintiff.

After executing the RISC and CDA and trading in her 2007 Mustang, Plaintiff left Defendant's facility driving a 2010

---

[2]Plaintiff originally testified that she did not remember signing the CDA and that Defendant did not explain the conditional nature of the transaction to her. However, Plaintiff admitted on cross-examination that she read and went over the CDA before signing it on 20 November 2010.

Mustang. Defendant maintained insurance on the 2010 vehicle throughout the entire time that the 2010 Mustang remained in Plaintiff's possession and never made any effort to transfer the vehicle's title to Plaintiff.

A few days after Plaintiff obtained possession of the 2010 Mustang, Defendant contacted Plaintiff and asked her to provide proof of additional income given that the information that she had provided did not suffice to support approval of the financing necessary to support the vehicle purchase. At that point, Plaintiff told Defendant that she was receiving an extra $1,000 a month "under the table" from her ex-husband and workers' compensation benefits. Although Defendant made a number of attempts to contact Plaintiff's ex-husband for the purpose of obtaining proof of the payments that Plaintiff claimed to be receiving, it never received the requested documentation. As a result, Defendant eventually informed Plaintiff that her request for credit had been denied and that Defendant was going to come pick up the vehicle. Subsequently, one of Defendant's employees went to Plaintiff's place of employment, took possession of the 2010 Mustang, and returned the 2007 Mustang that Plaintiff had traded in.

## B. Procedural History

On 10 December 2010, Plaintiff filed a complaint in which she sought to recover damages from Defendant based upon unfair and deceptive trade practices, conversion, and breach of contract claims. On 11 February 2011, Defendant filed an answer in which it sought to have Plaintiff's complaint dismissed, denied the material allegations of Plaintiff's complaint, and asserted a number of affirmative defenses. The issues raised by Plaintiff's complaint came on for trial at the 17 September 2012 civil session of the Durham County Superior Court. After the presentation of the evidence, the arguments of counsel, and the trial court's instructions, the jury returned a verdict finding that Plaintiff and Defendant had not entered into a contract and that Defendant had not converted the 2010 Mustang.

On 28 September 2012, Plaintiff filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. On 19 October 2012, the trial court entered a judgment based upon the jury's verdict which provided that "Plaintiff take nothing by this action and that it be dismissed with prejudice." On 1 November 2012, the trial court entered an order denying Plaintiff's motion for judgment notwithstanding the verdict. On 25 March 2013, the trial court entered an order denying Plaintiff's motion for a new trial. Plaintiff noted an appeal to this Court from the trial court's judgment and from

the orders denying Plaintiff's motion for judgment notwithstanding the verdict and for a new trial.

## II. Substantive Legal Analysis

### A. Jury Instructions

In her initial challenge to the trial court's judgment, Plaintiff contends that the trial court erred by failing to instruct the jury that the Uniform Commercial Code controlled the transaction between the parties. We do not find Plaintiff's argument persuasive.

On appeal, arguments "challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "A specific jury instruction should be given when '(1) the requested instruction was a correct statement of law and (2) was supported by the evidence, and that (3) the instruction given, considered in its entirety, failed to encompass the substance of the law requested and (4) such failure likely misled the jury.'" *Outlaw v. Johnson*, 190 N.C. App. 233, 243, 660 S.E.2d 550, 559 (2008) (quoting *Liborio v. King*, 150 N.C. App. 531, 534, 564 S.E.2d 272, 274, *disc. review denied*, 356 N.C. 304, 570 S.E.2d 726 (2002)). "When reviewing the refusal of a trial court to give certain instructions requested by a party to the jury, this Court must decide whether the evidence presented at trial was sufficient to support a

reasonable inference by the jury of the elements of the claim. If the instruction is supported by such evidence, the trial court's failure to give the instruction is reversible error." *Ellison v. Gambill Oil Co.*, 186 N.C. App. 167, 169, 650 S.E.2d 819, 821 (2007) (citations omitted), *aff'd per curiam and disc. review improvidently allowed*, 363 N.C. 364, 677 S.E.2d 452 (2009). However, the party seeking relief on appeal based upon an allegedly erroneous jury instruction must establish that the jury was misled or that the verdict was affected by an improperly omitted instruction. *Robinson v. Seaboard System Railroad*, 87 N.C. App. 512, 524, 361 S.E.2d 909, 917, *disc. review denied*, 321 N.C. 474, 364 S.E.2d 924 (1988). As a result, "it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury." *Id.* "[W]here a party fails to object to jury instructions, 'it is conclusively presumed that the instructions conformed to the issues submitted and were without legal error.'" *Madden v. Carolina Door Controls, Inc.*, 117 N.C. App. 56, 62, 449 S.E.2d 769, 773 (1994) (quoting *Dailey v. Integon Gen. Ins. Corp.*, 75 N.C. App. 387, 399, 331 S.E.2d 148, 156, *disc. review denied*, 314 N.C. 664, 336 S.E.2d 399 (1985)).

In this case, the trial court instructed the jury in accordance with N.C. Gen. Stat. § 20-72(b) that, "[i]n the context of automobile sales, no title to any motor vehicle shall pass or vest until an assignment and warranty of title is executed by the owner on the reverse certificate of title." Although Plaintiff has argued in her brief that the trial court's instruction to this effect was erroneous, we note that Plaintiff did not object to the challenged instruction at trial. In fact, when the trial court indicated its intention to deliver the challenged instruction during the jury instruction conference, Plaintiff admitted that the instruction was "a statement of the law, I can't argue about the law," and stated, "that's fine[,] I'm not going to fight much of that." As a result, since Plaintiff failed to object to this instruction at trial, "it is conclusively presumed that the instructions conformed to the issues submitted and were without legal error." *Madden*, 117 N.C. App. at 62, 449 S.E.2d at 773.

At trial, Plaintiff did object to the trial court's refusal to include additional UCC-based language in its instructions concerning the conversion issue. Although the trial court instructed the jury with respect to the issue of whether Defendant converted Plaintiff's 2010 Mustang in accordance with NCPJI 806.00, Plaintiff also contended that the jury should be

instructed that "[t]itle, and therefore ownership, passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place" in reliance upon N.C. Gen. Stat. § 25-2-401(2). However, we note that Plaintiff's requested instruction was not a correct statement of the applicable law given that it omitted any reference to the fact that the language from N.C. Gen. Stat. § 25-2-401(2) upon which Plaintiff relies begins "[u]nless otherwise explicitly agreed . . . ." As a result, particularly given Defendant's contention that the parties had, in fact, agreed that title did not pass to Plaintiff at the time of delivery, the omission of this caveat from Plaintiff's requested instruction rendered that instruction legally erroneous and obviated the necessity for the delivery of the instruction requested by Plaintiff. *See State v. Munoz*, 141 N.C. App. 675, 688, 541 S.E.2d 218, 226 (stating that, "if the requested instruction is not a correct statement of the law, the trial court can properly refuse to give it"), *cert. denied*, 353 N.C. 454, 548 S.E.2d 534 (2001).

Finally, Plaintiff simply did not argue at trial that the trial court should have instructed the jury to the effect that

the UCC, instead of the statutory provisions governing motor vehicle transactions, governed the relationship between the parties as she does on appeal. In fact, Plaintiff never objected to the trial court's instructions concerning the contract formation issue, all of which rested on the statutory provisions governing motor vehicle transactions. Instead, Plaintiff acknowledged that the trial court's proposed instructions based on N.C. Gen. Stat. §§ 20-75.1 and 20-3-3(a) were correct statements of the law and stated, instead, that she could "make that work in [the] closing argument." As result, given that the only UCC-based argument that Plaintiff advanced in the court below related to her conversion claim, given that the trial court instructed the jury in accordance with the relevant sections of the NCPJI, given that Plaintiff merely argued at trial that the UCC applied to the conversion issue, and since the trial court instructed the jury concerning the conversion issue in accordance with the relevant pattern jury instruction, *Henry v. Knudsen*, 203 N.C. App. 510, 519, 692 S.E.2d 878, 884 (stating that the applicable pattern jury instructions "provide[d] the jury with an understandable explanation of the law"), *disc. review denied*, 364 N.C. 602, 703 S.E.2d 446 (2010), we hold that none of Plaintiff's challenges

to the trial court's instructions provide any basis for overturning the trial court's judgment.

### B. Denial of Motions for Directed Verdict, Judgment Notwithstanding the Verdict, and a New Trial

Secondly, Plaintiff argues that the trial court erred by denying her motion for directed verdict at the close of all evidence and her motions for judgment notwithstanding the verdict and a new trial. In essence, Plaintiff contends that the undisputed evidence in the record, when considered in light of what she believes to be the relevant legal principles, required the trial court to grant the motions in question. Although Defendant contends that Plaintiff's challenge to the denial of her motion for a directed verdict was not properly preserved for review by this Court, we need not address this issue in light of our determination that none of the arguments that Plaintiff has advanced in the course of challenging the denial of these motions have merit.

### 1. Standard of Review

#### a. Motions for Directed Verdict and Judgment Notwithstanding the Verdict

A party is entitled to seek a directed verdict in his or her favor at the conclusion of an opponent's evidence and at the conclusion of all of the evidence. N.C. Gen. Stat. § 1A-1, Rule 50(b). *Overman v. Gibson Prods. Co.*, 30 N.C. App. 516, 519, 227 S.E.2d 159, 161 (1976). In addition, a party who made an

unsuccessful motion for a directed verdict at the conclusion of all of the evidence "may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict[.]" N.C. Gen. Stat. § 1A-1, Rule 50(b)(1). "A motion for [judgment notwithstanding the verdict] provides the trial court with an opportunity to reconsider the question of the sufficiency of the evidence after the jury has returned a verdict and permits the court to enter judgment 'in accordance with the movant's earlier motion for a directed verdict and notwithstanding the contrary verdict actually returned by the jury.'" *Primerica Life v. James Massengill & Sons*, 211 N.C. App. 252, 256-57, 712 S.E.2d 670, 675 (2011) (quoting *Ace, Inc. v. Maynard*, 108 N.C. App. 241, 245, 423 S.E.2d 504, 507 (1992) (internal quotation marks and citation omitted), *disc. review denied*, 333 N.C. 574, 429 S.E.2d 567 (1993)).

"A motion for judgment notwithstanding the verdict is essentially a renewal of the motion for directed verdict, and the same standard of review applies to both motions." *Zubaidi v. Earl L. Pickett Enterprises, Inc.*, 164 N.C. App. 107, 119, 595 S.E.2d 190, 197, *disc. rev. denied*, 359 N.C. 76, 605 S.E.2d 151 (2004). As a result, the standard of review utilized in reviewing an appellate challenge to a trial court's ruling with

respect to a motion for directed verdict or a motion for judgment notwithstanding the verdict is "'whether upon examination of all the evidence in the light most favorable to the nonmoving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury.'" *Branch v. High Rock Realty, Inc.*, 151 N.C. App. 244, 250, 565 S.E.2d 248, 252 (2002) (quoting *Fulk v. Piedmont Music Ctr.*, 138 N.C. App. 425, 429, 531 S.E.2d 476, 479 (2000)), *disc. review denied*, 356 N.C. 667, 576 S.E.2d 330 (2003). "In determining the sufficiency of the evidence to withstand a motion for a directed verdict [or judgment notwithstanding the verdict], all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor." *Turner v. Duke Univ.*, 325 N.C. 152, 158, 381 S.E.2d 706, 710 (1989). A motion for directed verdict or judgment notwithstanding the verdict "should be denied if more than a scintilla of evidence supports each element of the non-moving party's claim." *Weeks v. Select Homes, Inc.*, 193 N.C. App. 725, 730, 668 S.E.2d 638, 641 (2008) (citation omitted).

We review orders ruling on a motion for directed verdict or judgment notwithstanding the verdict *de novo*. *Austin v. Bald II, L.L.C.*, 189 N.C. App. 338, 342, 658 S.E.2d 1, 4, *disc. review denied*, 362 N.C. 469, 665 S.E.2d 737 (2008). "'Under a *de novo* [standard of] review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

### b. New Trial Motion

A challenge to the denial of a motion for a new trial is reviewed for an abuse of discretion. *Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982). An "[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

### 2. Substantive Legal Issues
### a. Breach of Contract Claim

In her brief, Plaintiff contends that the trial court erred by denying her motions for directed verdict, judgment notwithstanding the verdict, and a new trial with respect to her breach of contract claim. More specifically, Plaintiff asserts that the undisputed evidence establishes that the parties had a

contract which Defendant breached by refusing to accept Plaintiff's monthly payments and repossessing the vehicle prior to the date upon which Plaintiff's first payment was even due. Plaintiff's argument lacks merit.

"'The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.'" *Ahmadi v. Triangle Rent A Car, Inc.*, 203 N.C. App. 360, 362, 691 S.E.2d 101, 103 (2010) (quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)). The existence of an agreement to which at least two parties manifest an intent to be bound is an essential prerequisite to the making of a valid contract. *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921) (stating that mutual assent between the parties is an "essential element" of every contract); *see also Kirby v. Stokes Cty. Bd. of Educ.*, 230 N.C. 619, 626, 55 S.E.2d 322, 327 (1949) (stating that "[a] contract is an agreement between two or more persons or parties [based] on sufficient consideration to do or refrain from doing a particular act"). "There is no meeting of the minds, and, therefore, no contract, when 'in the contemplation of both parties . . . something remains to be done to establish contract[ual] relations.'" *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (quoting *Fed. Reserve Bank*

*v. Neuse Mfg. Co., Inc.*, 213 N.C. 489, 493, 196 S.E. 848, 850 (1938)). As a result, if the agreement between the parties is subject to the occurrence of some other event, no contract is formed until this condition precedent has been satisfied. *Parker*, 182 N.C. App. at 232, 641 S.E.2d at 737. "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Nationwide Mut. Fire Ins. Co. v. Mnatsakanov*, 191 N.C. App. 802, 805, 664 S.E.2d 13, 15 (2008) (quoting *Creech v. Melnik*, 347 N.C. 520, 527, 495 S.E.2d 907, 911 (1998)).

In this case, Plaintiff and Defendant signed an RISC which detailed the terms and conditions contained in the agreement between the parties and included provisions to the effect that Plaintiff was the buyer and Defendant was the seller/creditor, that the sale would be made subject to a specific price and payment terms, and that Defendant had assigned its interest in the contract to C&F Finance Company. In addition, both parties executed a CDA which, as we have already noted, provided that:

> University Ford is delivering this automobile based on the credit information received from the customer. Final approval of the terms of a retail installment sales contract rests solely with a lender. The terms of the retail installment sales contract are not binding until accepted by a designated lender. This contract is cancelled if the terms are rejected by a lender. If the contract is cancelled, the

> dealer will return the customer's deposit and trade-in vehicle. The customer agrees to pay for any damages done to the automobile during the time they had possession, and also agrees to indemnify University Ford for any damages caused to a third party. If the contract is cancelled, the customer will return the vehicle to University Ford within 24 hours of being notified by the dealer.

As a result of the fact that "separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement," with this being "true even where one contract states that there are no other agreements between the parties," *Zinn v. Walker*, 87 N.C. App. 325, 334, 361 S.E.2d 314, 319 (1987) (citing 3 *Corbin on Contracts* §578 (1960 and 1984 supplement)), the trial court had ample justification for allowing the jury to treat the CDA as part of the contract between the parties.

According to the undisputed record evidence, the lender rejected Plaintiff's request for the extension of the credit needed to support the purchase of the 2010 Mustang. As a result, acting pursuant to the CDA, Defendant repossessed the 2010 Mustang that Plaintiff had intended to purchase and returned both the deposit that Plaintiff had paid and the vehicle that she had traded in as part of the sale transaction. Although Plaintiff vigorously asserts that the execution of the RISC created a binding contract and that the trial court erred

by allowing the jury to make a contrary determination, the record clearly contained ample evidence permitting a determination that the CDA constituted a part of the agreement between the parties, that the CDA was a conditional delivery agreement rather than a conditional sales contract, and that there was no binding agreement between the parties in the event that the proposed lender declined to extend credit to Plaintiff. As a result, given that "[w]hether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact," *Nationwide Mut. Fire Ins. Co.*, 191 N.C. App. at 805, 664 S.E.2d at 15, and given that there was, at a minimum, a genuine issue of material fact concerning the extent, if any, to which the agreement embodied in the RISC ever became effective, we see no error in the trial court's decision to allow the jury to determine whether a binding contract between the parties existed.

In an attempt to persuade us to reach a different result, Plaintiff argues that the trial court should have refrained from allowing the jury to give effect to the CDA on the theory that the RISC contained a merger clause and that a decision to allow the jury to consider the CDA in determining whether a contract between the parties existed resulted in a violation of the parol evidence rule. However, as we have already noted, the record

would have supported a determination that the RISC and the CDA were both components of an overall agreement between the parties despite the fact that the RISC contained a merger provision. *Zinn*, 87 N.C. App. at 334, 361 S.E.2d at 319 (1987). In addition, according to well-established North Carolina law, "parol evidence is admissible to show conditions precedent, which relate to the delivery or taking effect of the instrument, as that it shall only become effective on certain conditions or contingencies[.]" *Bailey v. Westmoreland*, 251 N.C. 843, 845, 112 S.E.2d 517, 520 (1960). Thus, since the record contained ample evidence supporting a conclusion that the RISC and the CDA were part of a single overall contract despite the presence of a merger provision in the RISC and since parol evidence is admissible for the purpose of showing that a condition precedent has not been satisfied, we do not find Plaintiff's argument persuasive. As a result, the trial court did not err by denying Plaintiff's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial.

## b. Conversion Claim

In addition, Plaintiff argues that the trial court erred by denying her motions for a directed verdict, judgment notwithstanding the verdict, and a new trial with respect to her conversion claim. More specifically, Plaintiff contends that

all of the evidence tends to show that an unlawful conversion occurred. Once again, we conclude that Plaintiff's argument lacks merit.

A conversion occurs when there has been "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Mace v. Pyatt*, 203 N.C. App. 245, 256, 691 S.E.2d 81, 90 (quoting *Myers v. Catoe Construction Co.*, 80 N.C. App. 692, 695, 343 S.E.2d 281, 283 (1986)), *disc. review denied*, 364 N.C. 614, 705 S.E.2d 354 (2010). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). As a result, Plaintiff was required to show that she possessed an ownership interest in the 2010 Mustang that is the subject of this litigation in order to successfully maintain a conversion claim.

In attempting to persuade us that the trial court erred by denying her motions for a directed verdict, judgment notwithstanding the verdict, and a new trial, Plaintiff contends that ownership of the 2010 Mustang passed to her at the time of delivery. However, the undisputed evidence contained in the

present record tends to show that no certification of title evidencing Defendant's ownership was ever issued. In addition, Defendant presented testimony, based upon the language of the CDA, to the effect that the parties did not intend for a transfer of ownership to occur until financing had been obtained, an event which never occurred. As a result, in light of the evidentiary dispute with respect to this issue, we have no trouble agreeing with the statement made by Plaintiff's counsel at trial to the effect that "ownership is the issue for the jury" and hold that the trial court did not err by denying Plaintiff's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial with respect to Plaintiff's conversion claim.

### c. Unfair and Deceptive Trade Practices Claim

Next, Plaintiff contends that the trial court erred by denying her motion for a directed verdict, judgment notwithstanding the verdict, and a new trial with respect to her unfair and deceptive trade practices claim. In support of this contention, Plaintiff argues that CDAs like the one at issue here are inherently unfair and deceptive. Once again, we conclude that Plaintiff's argument lacks merit.

"To prevail on a claim of unfair and deceptive trade practices, a plaintiff must show: (1) defendant[] committed an

unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 171, 684 S.E.2d 41, 49 (2009) (quoting *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998)). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). "A practice is deceptive if it 'possesse[s] the tendency or capacity to mislead, or create[s] the likelihood of deception.'" *Poor*, 138 N.C. App. at 28-29, 530 S.E.2d at 845 (quoting *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 453, 279 S.E.2d 1, 7 (1981)).

According to Plaintiff, the use of a CDA results in a "spot delivery" or "Yo-Yo" sale, transactions that are inherently unfair and deceptive and that have been held to be unlawful in other jurisdictions. Acceptance of Plaintiff's argument would, however, require us to overlook the fact that the General Assembly has explicitly authorized the use of CDAs in N.C. Gen. Stat. § 20-75.1, which states that:

> Notwithstanding [N.C. Gen. Stat. §§] 20-52.1, 20-72, and 20-75, nothing contained in those sections prohibits a dealer from entering into a contract with any purchaser for the sale of a vehicle and delivering the vehicle to the purchaser under terms by

> which the dealer's obligation to execute the manufacturer's certificate of origin or the certificate of title is conditioned on the purchaser obtaining financing for the purchase of the vehicle.

N.C. Gen. Stat. § 20-75.1. In view of the fact that the use of CDAs is expressly authorized in this jurisdiction, we hold that there was ample justification for the trial court's decision to deny Plaintiff's motions for a directed verdict, judgment notwithstanding the verdict, and a new trial with respect to the unfair and deceptive trade practices issue.

### d. Punitive Damages Claim

Finally, Plaintiff contends that the trial court erred by denying her motions for a directed verdict, judgment notwithstanding the verdict, and a new trial with respect to her claim for punitive damages. According to Plaintiff, the record shows that Defendant never intended to abide by the terms of the contract between the parties, that Defendant had engaged in similar conduct for more than two decades, and that Defendant's conduct constituted fraud sufficient to support an award of punitive damages. We do not find Plaintiff's argument persuasive.

Punitive damages "are awarded as punishment due to the outrageous nature of the wrongdoer's conduct." *Juarez-Martinez v. Deans*, 108 N.C. App. 486, 495, 424 S.E.2d 154, 159-60, *disc.*

*review denied*, 333 N.C. 539, 429 S.E.2d 558 (1993). For that reason, punitive damages are "not allowed as a matter of course;" instead, "they may be awarded only when there are some features of aggravation, as when the act is done wilfully and evidences a reckless and wanton disregard of plaintiff's rights." *Scott v. Kiker*, 59 N.C. App. 458, 462, 297 S.E.2d 142, 146 (1982). As a general proposition, a punitive damages recovery is not available as the result of a breach of contract, with the exception of a breach of contract to marry. *Newton v. Standard Fire Insurance Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976). "Nevertheless, where there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort itself may give rise to a claim for punitive damages." *Id.* As a result of the fact that actionable fraud inherently involves intentional wrongdoing, punitive damages are available in the event that a litigant is harmed by fraudulent conduct on the part of the opposing party. *Newton*, 291 N.C. at 113, 229 S.E.2d at 302.

Actual fraud consists of a "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Mancuso v. Burton Farm Dev. Co. LLC*, __ N.C. App. __, __, 748 S.E.2d

738, 749, *disc. review denied*, __ N.C. __, 752 S.E.2d 149 (2013). The evidence contained in the present record simply does not establish any fraudulent conduct on the part of Defendant. On the contrary, the undisputed record evidence tends to show that Defendant believed that the CDA rendered the RISC ineffective in the event that Plaintiff's application for credit was not approved and that Defendant would not have repossessed the 2010 Mustang had the relevant lender made a different determination. Thus, Plaintiff's contention that Defendant never intended to honor the RISC notwithstanding, the record contains no indication that any "(1) [f]alse representation or concealment of a material fact, [that was] (2) reasonably calculated to deceive, [and] (3) made with intent to deceive," *Mancuso*, __ N.C. App. at __, 748 S.E.2d at 749, was ever made or that Defendant acted in such a manner as to exhibit "a reckless and wanton disregard of plaintiff's rights." *Scott*, 59 N.C. App. at 462, 297 S.E.2d at 146. As a result, the trial court did not err by denying Plaintiff's motions for a directed verdict, judgment notwithstanding the verdict, or a new trial with respect to the punitive damages issue.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Plaintiff's challenges to the trial court's judgment and

orders have merit.  As a result, the trial court's judgment and orders should, and hereby do, remain undisturbed.

NO ERROR.

Judges ROBERT N. HUNTER, JR., and DAVIS concur.

Report per Rule 30(e).